**In re Robert Matthew McGEE and Carol I. McGee, Debtors.**

**Sam D. HARMON and Melissa M. Harmon, Plaintiffs,**

**v.**

**Robert Matthew McGEE, Defendant.**

**Bankruptcy No. 92–31127–S. Adv. No. 92–3091–S.**

United States Bankruptcy Court, E.D. Virginia, Richmond Division.

Aug. 19, 1993.

Miles Cary, Jr., Minor, Saunders, Cary & Patterson, Richmond, VA, for plaintiffs.

Robert E. Hyman, Richmond, VA, for defendant.

## MEMORANDUM OPINION

BLACKWELL N. SHELLEY, Bankruptcy Judge.

This matter comes before the court on the plaintiff's second amended complaint to determine dischargeability of debt under 11 U.S.C. § 523 and to object to discharge under 11 U.S.C. § 727(a). After a trial held on January 28, 1993, at which the court heard arguments of counsel and after considering the briefs filed by the parties, the court renders its findings of fact and conclusions of law.

## STATEMENT OF CASE

The defendant, Robert Matthew McGee ("McGee" or "debtor"), and Carol I. McGee filed for joint Chapter 7 bankruptcy on March 6, 1992. Sam D. Harmon and Melissa M. Harmon, the plaintiffs, allege in Count 1 of the complaint that Robert McGee fraudulently obtained from them property worth $80,000 and that such debt should be found nondischargeable under § 523(a)(2)(A).[1]

In Count 2, the plaintiffs urge the court to deny the defendant a discharge of his debts, alleging the defendant, with the intent to hinder, delay or defraud a creditor, sold property of the estate after the date of the filing of the petition in violation of § 727. 11 U.S.C. § 727(a)(2)(B). The plaintiffs further allege that the defendant knowingly and fraudulently made a false oath in connection with the bankruptcy case. 11 U.S.C. § 727(a)(4)(A).

The plaintiffs allege that the debtor, after filing his petition and to the detriment of the estate and his creditors, sold a "plug" used for forming fiberglass car bodies, a frame table used for constructing car frames, a chassis, design drawings, a Bill of Materials containing a list of parts suppliers, and promotional items used in the manufacture and marketing of the Magnum GT 250, a classic sports car replica. The plaintiffs argue that the tangible and intellectual property were property of the bankruptcy estate which the debtor fraudulently failed to list on his schedules or disclose at the § 341 meeting of creditors. The plaintiffs argue that the court should deny the debtor a discharge for violating 11 U.S.C. § 727.

The debtor argues that he did not own the tangible items on March 6, 1992, the date he filed his petition. Not owning those items at the time he filed for Chapter 7 protection, he was not required to list them on his schedules nor could he have made a false oath in failing to list the property on his schedules. Since he did not own the property at the time he filed for bankruptcy, the items could not be property of the estate nor could selling them be a fraudulent transfer of property of the estate. In the alternative, the debtor argues that the tangible items he sold were worthless, and that the contract of sale was actually a consulting agreement and argues that any knowledge, skill, technical

---

1. Upon defendant's motion at the conclusion of the plaintiff's case, the Court made a finding of fact that the debt incurred was obtained by an alleged false representation not in writing of the debtor's financial condition. The Court concluded that obtaining money by an orally given false financial statement precludes a determination of nondischargeability of a debt under 11 U.S.C. § 523(a)(2)(A) and found that the debtor should have judgment as a matter of law pursuant to Federal Rule of Bankruptcy Procedure 7052(c) against the plaintiff on the § 523(a)(2)(A) issue.

expertise, or intellectual property included in the consulting agreement was excluded from property of the estate.

## FINDINGS OF FACT

McGee was the president, director, and a stockholder of Magnum Motorcar Company, Inc., a Virginia corporation, ("Magnum"). McGee owned seven percent of the stock of Magnum, which ceased operations in December 1990. The Harmons are creditors of Magnum and of McGee individually. At some time after he filed for Chapter 7 bankruptcy, McGee sold to Contemporary Classic Motor Car Company, Inc., a New York corporation ("Contemporary"), drawings, designs, a Bill of Materials, a "plug," frame table, chassis, and promotional materials relating to the manufacture and marketing of the Magnum GT 250, a replica of the classic Ferrari GT 250 Spyder California sports car. McGee did not list these items of personal property on his Schedule of Assets nor did he disclose them nor his intention to sell them at his § 341 meeting of creditors. McGee did not list his stock ownership in Magnum on his bankruptcy schedules nor did he disclose the value of his ownership interest at the § 341 meeting.

McGee and Contemporary first began negotiations regarding the sale of all Magnum's assets in August, 1991, the year before McGee filed bankruptcy. Peter E. Bayer, Contemporary's president, visited McGee in Richmond to inspect the assets offered for sale at a purchase price of $250,000. The August 1991 visit did not result in a sale between Magnum and Contemporary. *See* Plaintiff's Exhibits 10 and 11. However, Bayer testified in deposition that in March 1992, the month in which McGee filed bankruptcy, McGee contacted him in New York to renew discussions regarding the sale of certain items of property. Bayer testified that he "received a call from Mr. McGee sometime in early March 1992 indicating he was interested in discussing the possible sale of items belonging to him...." Deposition of Peter E. Bayer and Monty Gatti ("Depo.") at 47. Bayer returned to Richmond in March,

1992, to inspect certain items for possible purchase. Bayer testified that several of the items offered for sale in March 1992 were the same Magnum assets offered for sale in August 1991, yet McGee represented during the March 1992 visit that he owned the property personally. Depo. at 46. McGee told Bayer "that things had changed, if we were interested in purchasing some of the elements that went into producing the car, which were his personally, owned by him personally, that he was looking to dispose of them at that time." Depo. at 57.

At the March 22, 1992, meeting in Richmond, McGee told Bayer that he would not be in a position to finalize the deal until after a creditor's meeting scheduled for April 9, 1992, at which time the ownership of Magnum's assets would be resolved. Depo. at 60. McGee did not tell Bayer at that time that he had filed Chapter 7 and that the meeting would be his own Meeting of Creditors. On April 12, 1992, the Monday after the debtor's § 341 creditor's meeting, Bayer received a facsimile letter from McGee offering nine items for sale at a total price of $50,000. Plaintiff's Exhibit 12; Depo. at 59. After several phone calls and faxes the parties agreed to the purchase and sale of some of the items for $20,000, which Bayer picked up in June, 1992. *See* Plaintiff's Exhibits 6, 13, 14. Contemporary made partial payment to McGee and twice requested technical assistance over the phone, but refused to make further payment and declined to contact McGee for further technical assistance because of their potential liability in this case.

It appears to this Court that the plug, frame table, and chassis once belonged to Bud Industries, Inc., Magnum's wholly owned subsidiary which actually built the car. At the time Magnum ceased operations in December of 1990, McGee discarded the "plug" and frame table next to a dumpster behind Magnum's shop. Robert C. McGee, the debtor's father and director and controlling stockholder of Magnum, testified that the corporation abandoned the plug and frame table behind the shop when Magnum closed down. The debtor

testified that he gave away the chassis to one of Magnum's creditors who agreed to allow him to sell it to Contemporary. McGee alleges that he did not personally own any of the tangible goods at the time he filed bankruptcy on March 6, 1992, and claims that the design drawings, promotional materials, and Bill of Materials sold to Contemporary were either his own personal post-petition property or otherwise not property required to be listed nor disclosed.

However, the plaintiffs produced three Bills of Sale in which McGee represents that he owned the property personally. *See* Plaintiff's Exhibits 7, 8, 9. In the first Bill of Sale dated June 3, 1992, McGee certified that he owned the items since December 31, 1990. Plaintiff's Exhibit 7. The court notes that December 31, 1990, coincides with the date Magnum ceased operations. No affidavit accompanied the first Bill of Sale. Contemporary Classic rejected the first Bill of Sale for irregularities in the notarial acknowledgement and requested McGee to complete a second Bill of Sale.

In the second Bill of Sale dated July 7, 1992, McGee certified that he owned the items by his signature on the document, but left out the date of original ownership. In the affidavit accompanying this Bill of Sale, McGee swore that he had not filed bankruptcy, an intentional misstatement. Plaintiff's Exhibit 8 at 2. Contemporary rejected this Bill of Sale for irregularities in the completion, specifically the omission of the original date of ownership, and refused payment until McGee completed a third Bill of Sale.

In the third Bill of Sale, dated July 1992, McGee certified that he owned the items since April 1, 1992. Plaintiffs' Exhibit 9. This Court notes that the April 1 date comes after the debtor filed his Chapter 7 petition on March 6, 1992, and that ownership on April 1 would exclude these items from property of the bankruptcy estate. McGee states that he pulled this date out of thin air, that the April 1, 1992, date had no real meaning but to satisfy Contemporary. In the affidavit accompanying the third Bill of Sale, McGee swore a second time that he has not filed bankruptcy. Plaintiff's Exhibit 9 at 2. The notarial affirmation indicates that McGee signed the third Bill of Sale and its affidavit on July 10, 1992. This Court finds that McGee's false affidavits, the discrepancies in the Bills of Sale regarding original date of ownership, and his failure to list the stock ownership in Magnum amount to a reckless indifference to the truth which severely inhibits his credibility as a witness in his own defense.

In his defense, McGee denies that the property sold was actually worth anything. The plug used to mold new car bodies had been damaged beyond repair before he sold it to Contemporary. When Magnum ceased operations, McGee abandoned the plug and frame table behind the shop next to a dumpster where they sat for the next 18 months. Bayer admitted that Contemporary scrapped the frame table and chassis immediately upon delivery. Depo. at 27–28. In place of the promotional materials and glossy photographs used in marketing, McGee delivered oversized picture postcards, the items promised in the Bill of Sale not being available.

McGee also points to testimony of the Chapter 7 trustee, Stephen Buis, who testified that he conducted an investigation into allegations that the debtor sold assets of the estate. Conversations after-the-fact with the debtor, the debtor's attorney, and Contemporary's attorney, convinced the trustee that the primary value of the contract was McGee's technical input. The trustee testified on direct examination that he would have abandoned the property had he known about it, as it was not worth the cost of liquidation.

The plaintiffs dispute the worthlessness of the property and point to testimony of Contemporary's president that Contemporary could have bought similar property for $8000 from a Texas builder, the same items the debtor himself valued in the Bills of Sale at $20,000. They urge the court to find that the debtor cannot claim the property has value, and then argue that it does not. The plaintiffs further argue that the

creditors should determine whether the property has value to the estate, not the debtor or the trustee, and urges the court to discount the testimony of the Chapter 7 trustee. They point out that the Chapter 7 trustee admitted on cross examination that he had no knowledge that the debtor place a value of $50,000 on the property on the Monday after the § 341 meeting and indicated that prior knowledge of the value that the debtor placed on the property might have changed his opinion that he would have abandoned the property. *See* Plaintiff's Exhibit 12.

McGee argues that since the tangible items of personal property included in the Bills of Sale were nearly worthless, the transaction derived its true value from his consulting services outlined in item E:

> "Seller will promptly and precisely respond to any technical questions that CONTEMPORARY CLASSIC MOTOR CAR COMPANY, INC. might pose concerning the manufacture on [sic] assembly of the GT250 Spyder replica."

Plaintiff's Exhibits 7, 8, 9, Item E. McGee argues that, without the technical expertise contracted for in Item E, the design drawings and Bill of Materials listed in Item A were worthless to Contemporary. *See* Depo. at 24. Item A included "Designs, Drawings, and Bill of Materials required by Contemporary Classic Motor Car Company, Inc., to manufacture and assemble the GT 250 Spyder replica." Plaintiff's Exhibits 7, 8, 9: Item A.

The court questioned McGee regarding the design drawings. He testified that in late 1990 he and an employee of Bud Industries, Inc., made several pencil sketches of the next generation car, which Magnum hoped to produce at a later date. Bayer testified that these drawings "were part of his [McGee's] technical expertise." Depo. at 10, 1.13. The debtor admits in his brief that the new car plans included technical notes and drawings of parts of fenders, bolts, and a chassis. The debtor claims the plans were merely ideas of a possible next generation automobile and admits he took possession of these plans when Magnum ceased operation in 1990. This Court notes that McGee would have had possession of the plans when he filed his schedules on March 6, 1992.

The Court notes that Contemporary could have purchased a plug, frame table, and a chassis from another seller for $8,000. When questioned about the additional $12,000 expense, Bayer stated that "his [McGee's] technical knowledge of the assembly of the car would tremendously speed up our redevelopment of the car." Depo. at 24. When questioned as to whether the design drawings embodied this technical knowledge, Bayer testified that most of the drawings were chassis drawings, which Contemporary was not going to use, but that "It was really in the area of actual assembly of the car and sourcing element required for assembly that we felt his assistance warranted the additional expenditure," and not engineering design. *Id.* This Court finds from the testimony and evidence that a major portion of the price of the Bill of Sale was for the purchase of McGee's sourcing ability, and not for the tangible items or the design drawings.

The Bill of Materials was a list of vendors across the country which supplied the various parts for the car. Monty Gatti, Contemporary's engineer, testified that Contemporary was able to reduce its sourcing time using the Bill of Materials purchased from McGee, "We have a sheet that tells us where these pieces are." Depo. at 32, 1.7–10. In fact, Gatti attributed McGee's entire technical expertise not to his car-building knowledge, but to his sourcing ability, stating:

> McGee's expertise would be in where to source the parts out for this car. We're Cobra people, we don't know about Ferrari and other pieces that he's putting on the car. His glass, chrome trim, these parts that if we spent ten hours of doing it, a phone call would do it in a matter of minutes. That's why we want McGee.

Depo. at 29. Gatti agreed that basically what McGee could provide was the knowledge of where to acquire the parts needed to assemble the car. *Id.*

McGee urges the court to find that the Bill of Materials was part of a post-petition consulting contract which could not be property of the bankruptcy estate. The debtor alleges that the Bill of Materials was technical knowledge in his memory that had not been reduced to writing before filing his petition. He argues that without his technical expertise the Bill of Materials had no value and, therefore, it was not an asset required to be listed in the bankruptcy schedules. In arguing that the list of vendors was not property of the estate, McGee states that:

His specific knowledge of where to get certain parts from certain wholesalers or retail auto parts dealers around the country would certainly not constitute any definition of property which should be listed in a petition and thereafter valued by the debtor in filling out his schedules of assets.

Debtor's Brief at 11.

However, the deposition testimony of Monty Gatti, Contemporary's engineer, indicates that the Bill of Materials had value in and of itself. *See* Depo. at 31–34. Gatti explained that if information can reduce the sourcing to minutes or hours, it has value. Depo. at 32. Gatti states that:

The sourcing of the parts, where he brought a hinge from, where brought a light from, where he got a light fixture, this is worth money because it's time consuming. We're not talking about a 1992 car. We're talking about a vintage automobile. And when you start sourcing this out, it takes months.

Depo. at 31, 1.18–24. It appearing to the Court that Magnum built several cars using the Bill of Materials as a sourcing guide, this Court rejects the debtor's claim that the Bill of Materials was not reduced to writing until after he filed for bankruptcy, especially in view of the debtor's reckless indifference to the truth in other matters relating to this bankruptcy and his representation that he owned the property since December 3, 1990. *See* Plaintiff's Exhibit 7.

From the evidence before this Court, this Court finds that the written Bill of Materials has value apart from McGee's technical knowledge, that McGee's "technical expertise" contracted for in the Bills of Sale amounted to his sourcing ability and not to any personal knowledge regarding car assembly, that the written Bill of Materials that McGee sold to Contemporary embodied substantially all of the "technical expertise," i.e. his sourcing ability contracted for in Item E of the Bills of Sale, and that a major portion of the purchase price of the Bill of Sale was paid in exchange for the information embodied in the written Bill of Materials. From the foregoing findings, this Court further finds that the documents labeled Bill of Sale are in fact contracts for the sale of goods and not consulting agreements as the debtor would have the Court believe.

The questions remaining for the Court are whether McGee, who owned seven percent of Magnum, had any personal interest in the design drawings, the Bill of Materials, the "plug," the frame table, the chassis, and the promotional material sold to Contemporary in the Bill of Sale which would sustain an objection to discharge under 11 U.S.C. § 727(a).

## CONCLUSIONS OF LAW

A debtor is not entitled to a discharge if the debtor

(2) ... with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with the custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed or has permitted to be transferred, removed, or destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition;

. . . . .

(4) the debtor knowingly or fraudulently, in or in connection with the case—

(A) made a false oath or account; ...

11 U.S.C. § 727(a)(2)(A), (B), (a)(4). The burden of proving that the debtor should be denied a discharge is upon the objector. *See* Fed.R.Bankr.Pro. 4005. This Court holds that the preponderance of the evidence standard of proof applies to the denial of a debtor's Chapter 7 discharge under 11 U.S.C. § 727, and follows the holdings in those objection to discharge cases which adopt the Supreme Court's reasoning in *Grogan v. Garner (In re Garner)*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). *See, e.g., Nisselson v. Wolfson (In re Wolfson)*, 139 B.R. 279 (Bankr.S.D.N.Y.1992); *Union Bank of the Middle East, Ltd. v. Farouki (In re Farouki)*, 133 B.R. 769 (Bankr.E.D.Va.1991); *U.S. v. Sumpter (In re Sumpter)*, 136 B.R. 690 (Bankr. E.D.Mich.1991).

I. Section 727(a)(2)(A), (B) Objection to Discharge

A. *Concealment of Stock Ownership*

 The plaintiff must establish that the debtor concealed the property with the intent to hinder, delay or defraud creditors. 11 U.S.C. § 727(a)(2). The court in *In re Farouki* held that "because a debtor is unlikely to testify directly that his intent was fraudulent, the Court may deduce fraudulent intent from all the facts and circumstances of a case." 133 B.R. at 780 (citing *Williamson v. Fireman's Fund Ins. Co.*, 828 F.2d 249, 252 (4th Cir.1987)). Fraudulent intent may be established by inferences drawn from a course of conduct. *Id.* Courts have recognized that a "reckless indifference to the truth is a functional equivalent of fraud." *Id.* (citing *In re Tully*, 818 F.2d 106, 112 (1st Cir.1987)).

 The plaintiffs allege that McGee concealed his 7% ownership of Magnum with the intent to hinder, delay, or defraud creditors. *See* § 727(a)(2)(A). McGee failed to list his stock ownership on his schedules. When he did disclose the ownership at the § 341 meeting, he told the trustee and the creditors present that the stock was "worthless." However, McGee testified that between the time he filed for bankruptcy and the date of his meeting of creditors one month later, Contemporary contacted him regarding their interest in purchasing assets of Magnum. McGee told Contemporary that he must wait until after his creditors meeting where the ownership of Magnum assets would be resolved. Since by his own admission, McGee states that Contemporary contacted him about purchasing assets in Magnum, he must have known that those assets had value to someone, and therefore his 7% stock ownership was not worthless. Four days after his § 341 meeting McGee sent Contemporary a letter which valued Magnum assets at $50,000. This Court finds that McGee's statement to the trustee at his § 341 meeting that the stock was worthless, in view of his admission that Contemporary had recently contacted him regarding purchase of some of Magnum's assets, showed reckless indifference to the truth, which is the functional equivalent of fraud. *In re Farouki*, 133 B.R. at 780. This Court finds that McGee failed to schedule his 7% stock ownership in Magnum, and then lied about the value of his stock at the § 341 meeting, with the intent to hinder, delay, and defraud his creditors.

B. *Transfer of Property of the Debtor or of the Estate*

 The plaintiffs further allege that the debtor violated the spirit of the Bankruptcy Code and should be denied a discharge for concealing and transferring property of the estate. 11 U.S.C. § 727(a)(2)(B). McGee admits to selling the items listed in the Bills of Sale to Contemporary without listing them in his schedules. But the debtor argues that he did not conceal or transfer assets of the estate when he sold the property to Contemporary because he did not own the property on the date he filed bankruptcy.

It appears to this Court that the preponderance of the evidence is to the contrary. The debtor and his father, as controlling stockholders, officers, and directors of Magnum, abandoned the plug in the frame table along with other tangible assets of the corporation in December of 1990. The Court finds that the debtor swears in the first Bill of Sale that he owned the proper-

ty as of December 31, 1990. Plaintiffs' Exhibit 7. The date of abandonment coincides with the date that the debtor says he acquired ownership of the tangible property. By the debtor's own statement that he owned the property as of December 31, 1990, it appears to this Court that the debtor took title to the property upon the corporation's abandonment of it. Peter Bayer, Contemporary's president, testified that McGee indicated he was interested in selling items belonging to McGee personally. Depo. at 47. Bayer testified that the items he saw at the March 1992 inspection were the same Magnum assets offered for sale in August 1991, yet McGee represented that he owned the property. Bayer testified that McGee told him "that things had changed, if we were interested in purchasing some of the elements that went into producing the car, which were his personally, owned by him personally, that he was looking to dispose of them at that time." Depo. at 57. McGee admits selling these items. The evidence shows he pocketed part of the proceeds of the sale, furthering the presumption of ownership established by the first Bill of Sale in which McGee represents December 31, 1990, original date of ownership. In view of all the preponderance of evidence, it appears to this Court that McGee acquired ownership of the property on December 31, 1990, (owned it on the date he filed bankruptcy) and has transferred assets of the estate after the filing of the petition with the intent to hinder, delay, and defraud creditors. *See* 11 U.S.C. § 727(a)(2)(B).

## II. Section 727(a)(4)(A) Objection to Discharge

This Court further finds that the debtor violated § 727(a)(4)(A) when he knowingly and fraudulently, in or in connection with the case, made a false oath or account. The purpose of inquiry into a § 727(a)(4)(A) allegation "is to insure that dependable information is supplied for those interested in the administration of the bankruptcy estate on which they can rely without the need for the trustee or other interested parties to dig out the true facts in examinations or investigations."

*Id.* at 782 (citing *In re Diodati,* 9 B.R. 804, 807 (Bankr.D.Mass.1981)). The Fourth Circuit has stated that "the debtor must have made a statement under oath which he knew to be false and he must have made the statement willfully, with intent to defraud." *Williamson v. Fireman's Fund,* 828 F.2d at 251.

The plaintiffs contend that the debtor's statement of financial affairs does not disclose his 7% ownership in Magnum and, therefore, the debtor made a false oath when he swore the statements were correct. Although the debtor did disclose his stock ownership in his § 341 hearing, he declared to the trustee and the creditors present that the stock was worthless. This Court finds such statements to be made with reckless indifference to the truth and the omission to be material as it relates to the debtor's assets. In his defense, the debtor argues that even though he cheated Contemporary Classic, cheated the creditors of Magnum, lied to the trustee about the value of his stock, that he did not cheat his bankruptcy estate. It appears to this Court that the debtor's version of the facts cannot be believed. The debtor has shown by his execution of false affidavits in the Bills of Sale that he is not a credible witness. It appears to this Court that the debtor with intent to hinder, delay and defraud his creditors failed to list his stock ownership on his schedules and under oath declared they were worthless in a § 341 meeting. Therefore, he made a false oath in connection with the bankruptcy case and should be denied a discharge under 11 U.S.C. § 727(a)(4)(A).

## III. Concealment of Intellectual Property as Grounds for Objection to Discharge

Even if the Court were to believe that the plug, frame table, and chassis, were not property of the debtor or of his bankruptcy estate, the debtor admits that the design drawings and Bill of Materials belong to him. In fact, the debtor argues that the date on the first Bill of Sale, where he swears he owned the property on December 31, 1990, was actually the date which he acquired his technical knowledge and sourcing ability. McGee never alleges

that he abandoned his technical knowledge or sourcing ability nor that such intellectual property was ever property of the corporation. McGee alleges that he owned the intellectual property all along, only that it was not the kind of property necessary to be scheduled or disclosed to a trustee in bankruptcy. However, it appears to this Court that such intellectual property is required to be listed on a debtor's schedule and disclosed to the trustee.

Section 101(56)(A) of the Code defines one type of "intellectual property" as "trade secrets." 11 U.S.C. § 101(56)(A). State law defines what property constitutes a trade secret. The Code of Virginia states that:

> "trade secret" means information, including but not limited to, a formula, pattern, compilation, program, device, method, technique, or process, that:
>
> 1. Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and
>
> 2. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Va.Code Ann. § 59.1–336 (Repl.Vol.1992) (definitions section of the Virginia Uniform Trade Secrets Act). The Supreme Court of Virginia defined trade secret as something of value that gives a competitive advantage, generally unknown in the trade or business, for which the owner, in order to protect it, must take reasonable steps to keep secret. *Dionne v. Southeast Foam Converting*, 240 Va. 297, 302, 397 S.E.2d 110, 113 (1990).

Cases state, and the debtor in his brief agrees, that intellectual property held by a debtor at the time he files a petition is property of the estate. "It is undisputed that the property of the debtor's estate includes the debtor's intellectual property, such as interest in patents, trademarks, and copyrights." *Chesapeake Fiber Pkg. v. Sebro Packaging Corp.*, 143 B.R. 360 (D.Md.1992) (citing *United States v. Inslaw Inc.*, 932 F.2d 1467, 1471 (D.C.Cir.1991)). Section 541 of the Bankruptcy Code describes property of the estate as "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1).

In the case of *Fairbanks, Trustee v. Dudenhoffer (In re Uniservices)*, 517 F.2d 492 (7th Cir.1975), the court found it proper to determine what constitutes protectable property under state law and to declare property rights accordingly. 517 F.2d at 496 (citing *In re Bettinger Corp.*, 197 F.Supp. 273 (D.Mass.1961)). The *Uniservices* court followed Indiana law to find that *"confidential information*, such as names and addresses and requirements of customers, and the advantage acquired through representative contact with the trade in the area of their application, *is a property right* which an owner is entitled to protect." 517 F.2d at 496 (emphasis in original). The defendant in *Uniservices* previously sold the information to the debtor for $1.5 million. The assignment of independent market values to the customer information in that case underscores its nature as protectable property. The Seventh Circuit found such information-type property to be protectable against misappropriation and enjoined the defendant from using the date in competition with the debtor for five years. 517 F.2d at 497.

Applying the Seventh Circuit holding in *Uniservices* to the case at bar, it appears to this Court that Virginia law comports with Indiana law in finding confidential information to be protectable property. The Bill of Materials which McGee sold to Contemporary included the written names and addresses of the vendors which manufactured and sold the parts that fit on the car. This Court has already found that the Bill of Materials existed in writing and had value in and of itself. *See* Findings of Fact, *supra*, at 969–72. McGee "assigned an independent market value" to the information, affixing a price to the Bill of Materials when he offered to sell it to Contemporary. *See* Plaintiff's Exhibits 7, 8, 9; Item A. Peter Bayer testified that he valued the vendor list, as it would take Contemporary months to track down the vendors without such a list.

This Court finds the Bill of Materials listing specific vendors of car parts to be

valuable information-type property similar to the customer list in *Uniservices*. The Bill of Materials was not generally known to or readily ascertainable by Contemporary, who would obtain economic value from its use. McGee purposefully kept this information secret. He concealed this information from his creditors and the trustee, only disclosing it upon the sale to Contemporary. It appears to this Court that the Bill of Materials would constitute a "trade secret" under Virginia law. *See* Va.Code § 59.1–336. Since the debtor owned[2] this trade secret at the time he filed for Chapter 7 protection, this Court finds the vendor list, which the debtor sold post-petition, to be property of the bankruptcy estate, requiring it to be listed on the schedule of assets. *See In re Bettinger Corp.*, 197 F.Supp. 273 (D.Mass.1961). The sale of this trade secret constituted a violation of § 727(a)(2)(B), for which the debtor should be denied a discharge. 11 U.S.C. § 727(a)(2)(B).

The debtor introduces the testimony of the Chapter 7 trustee in support of his argument that the contract was actually one for technical expertise, and not one for the sale of property. The trustee testified that he would have abandoned the property as it was not worth the cost of liquidation. This Court finds no merit in the debtor's argument. A trustee's special duty to conserve the bankruptcy estate's limited resources while attempting to maximize the value the estate gives him a particular economic point of view when valuing of property of the estate. In a Chapter 7 with limited assets, the trustee has an economic incentive to decline to pursue estate assets of questionable value. The plaintiffs argue that neither the debtor nor the trustee can properly determine the value to creditors of property of the estate. This Court finds that the trustee's testimony does not help to prove the debtor's argument that the sale of the debtor's property was in reality a contract for consulting services.

For the foregoing reasons, it appears to this Court that the debtor, with the intent to hinder, delay and defraud his creditors, concealed his property and property of the estate in failing to disclose his stock ownership of Magnum and in selling the plug, frame table, chassis, design drawings, promotional items, and Bill of Materials to Contemporary. The debtor should be denied a discharge under 11 U.S.C. § 727(a)(2)(A). It further appears that the debtor concealed and transferred property of the estate, the written Bill of Materials, a trade secret which this Court finds to be intellectual property under Virginia law. For this reason, McGee should be denied a discharge under 11 U.S.C. § 727(a)(2)(B). It further appears that the debtor in failing to schedule his stock and in stating under oath at his § 341 meeting that the stock had no value, made a false oath in connection with his bankruptcy case. For this act, the debtor should be denied a discharge under 11 U.S.C. § 727(a)(4)(A).

An order conforming to this Memorandum Opinion will be entered contemporaneously herewith.

---

**2.** If the debtor knew it had value, it was either his property, or as he asserts, it was as asset of Magnum in which he had a stockholder interest.