Ronald R. PETERSON,
Trustee, Plaintiff,

v.

Richard E. SCOTT, et al., Defendants.

In re Richard E. and Marilyn SCOTT,
Douglas W. Scott, Douglas H. and
Sarah Scott, Debtors.

No. 96 C 4918.
Adversary Nos. 90 A 0535, and 85
B 15663 thru 85 B 15665.

United States District Court,
N.D. Illinois,
Eastern Division.

April 1, 1997.

Timothy J. Chorvat, Clyde David Watson, Jenner & Block, Chicago, IL, for Ronald R. Peterson.

Douglas W. Scott, Wheaton, IL, pro se.

Douglas H. Scott, Wheaton, IL, pro se.

Sandra Rasnak, Michael K. Desmond, Roman Sukley, U.S. Trustee, Chicago, IL, for M. Scott Michel.

## MEMORANDUM OPINION AND ORDER

GOTTSCHALL, District Judge.

In his capacity as trustee of three bankruptcy estates, Ronald R. Peterson ("Peterson" or "the Trustee") brings this appeal under 28 U.S.C. § 158(a). This is actually the second time the case has been before the district court on appeal, as Judge Duff remanded the case in April 1995, without reversing the bankruptcy court. The initial subjects of appeal were three orders of bankruptcy judge Thomas James ("the bankruptcy judge" or "the bankruptcy court") in the Trustee's consolidated adversary proceeding against appellees Richard E. Scott ("Richard E."), Douglas H. Scott ("Douglas H.") and

Douglas W. Scott ("Douglas W."). For the reasons stated in those orders, the bankruptcy court entered judgments in favor of all three appellees and dismissed the Trustee's complaint objecting to discharge under 11 U.S.C. § 727(a). Besides appealing from the bankruptcy court's rulings under § 727(a), the Trustee appeals the bankruptcy court's order on remand in which he refused to reconsider his earlier orders. Before this court, the Trustee adopts the arguments made in briefs filed by the United States Trustee ("U.S. Trustee")[1] as *amicus curiae.*

## BACKGROUND AND REVIEW
## OF THE RECORD

The appellee family members (collectively "the Scotts") were engaged in the business of marketing interests in tax shelter limited partnerships until reductions in the rate of inflation, decreases in oil prices, and proposed changes in the tax laws caused that market to collapse around 1985. Per the parties' submissions, the Scotts controlled and operated approximately 70 interrelated limited partnerships and corporations. At the time the Scotts and a number of those related entities filed for reorganization under Chapter 11 of the Bankruptcy Code[2] in 1985, many of the limited partnerships invested in single-family homes.

Dean Harvalis ("Harvalis"), the Assistant U.S. Trustee assigned to supervise the Scott cases, testified in the bankruptcy court that he became involved with committees of limited partners and secured creditors in the single-family home limited partnership cases, which were then in Chapter 11. The Scotts' individual cases were also proceedings under Chapter 11 at that time.

Harvalis' involvement with the cases increased after a group of seven or eight other limited partnerships, which Harvalis described as "the mortgage fund partnerships," filed for reorganization in 1989. According

to Harvalis, because the U.S. Trustee could see no legal or factual basis for the mortgage fund bankruptcies, there was a concern that the equity of limited partners in the mortgage funds would be applied to overcome objections of secured creditors in the single-family home partnership cases. The Scotts allegedly purported to do this by filing a consolidated plan of reorganization. Around that time, the Scotts also prepared draft disclosure statements for use in their individual cases.

Per Harvalis' testimony, during the pendency of discussions about the Scotts' disclosure statements and individual plans of reorganization, creditors became concerned that the Scotts were concealing assets. That concern led to Peterson's appointment as trustee. Ultimately, the individual cases, as well as those of a number of other Scott entities, were converted to proceedings in liquidation under Chapter 7. In his capacity as trustee in the individual cases, Peterson filed a complaint objecting to the discharges of Richard E., Douglas H. and Douglas W.

## Allegations Concerning the Nature of
## the Scotts' Business Operations
## in General

Throughout the course of these proceedings, the Trustee has emphasized that members of the public lost over twenty million dollars invested in partnerships organized and operated by the Scotts. A sizeable portion of funds raised went to the Scotts or to entities they controlled. For instance, Richard E. acknowledged at trial that of investor funds raised by any particular partnership, 26% or more was paid to the Scotts or related entities for services rendered. Also, annual management fees were to be paid to the Scotts or related entities from income generated by partnership property. According to Harvalis. in instances where the rental in-

---

1. Since Peterson is the appellant, this memorandum refers to the arguments for reversal as having been made by the Trustee. Nonetheless, with the exception of certain arguments made on remand, virtually all the arguments on both appeals have been made by the U.S. Trustee. In contrast, at some points in the proceedings below, the Trustee and the U.S. Trustee were each represented by their own attorney. As appropri-

ate, references to arguments made by "the Trustee" in this opinion should be understood as references to arguments formulated by the U.S. Trustee.

2. Hereafter, all references to statute are to the Bankruptcy Code, 11 U.S.C. § 101 *et seq.*

come received by a particular partnership was insufficient to pay fees due other Scott entities, cash was funnelled via a complex system of loans from more solvent entities so as to enable the cash-strapped partnership to pay the Scotts. Although some of the entities involved in those transfers of cash were debtors in Chapter 11, and therefore obligated to file reports of their activities, non-debtor entities also played a role in the process. A study of monthly reports made by the U.S. Trustee's office in 1989 showed that partnerships having cash paid management fees to IRE Services ("IRE"), an entity not in bankruptcy, and that IRE made unexplained cash advances to other Scott entities that lacked cash. Following the infusion of cash, the recipient entities would then pay IRE its management fees. Harvalis further testified that IRE paid personal legal expenses of the Scotts with funds that would have come from debtor entities.

At the April 1993 trial on the Trustee's complaint, expert witness Craig T. Elson ("Elson"), testified that funds received from investors were frequently swept from partnership accounts and transferred to clearinghouse accounts, where they were commingled with funds from other Scott entities. Funds would later be transferred from the clearing accounts to other entities. While Elson opined that it would take a "Herculean" effort and thousands of hours to trace all the transfers, he had analyzed a number of transactions between Scott entities.

As an example, Elson testified that during an 18-day period in November 1984, virtually all the $180,000 of limited partner contributions received by the TGS-84 partnership were reallocated to Scott-owned entities or to "syndication," one of the clearinghouse checking accounts. Some of those funds were ultimately used to pay debts of Transmission America, a Scott entity engaged in a business distinct from that of TGS-84. Yet other funds from TGS-84 were used to satisfy IRE's payroll taxes.

On the other hand, Elson acknowledged that there were transfers of cash back into TGS-84, and the partnership did end up owning property. To understand why TGS-84 was unable to pay its limited partners, though, one would have to trace all the inflows and outflows of cash from the partnership.

As other examples of inter-entity cash transfers, Elson cited the funding of Equine Equities in November 1984 and the funding of Tara Farms in 1985. Among uses to which funds from Tara Farms were put, $292,000 was used by Reel Partners II to discharge an obligation on which the Scotts were contingently liable. At the time, Reel Partners lacked sufficient assets to repay Tara Farms. To Elson's knowledge the money was not repaid to Tara Farms, although the movement of funds between entities made it impossible to say so with certainty.

Before the bankruptcy court, the Trustee argued that the transfers of funds created a mass of inter-entity debts and accounts receivable. According to the Trustee, when money was paid into a partnership by investors, the Scotts would use those funds for personal purposes or to satisfy obligations of their other entities, with little regard for the business needs of the transferor partnership or its investors. In return for the cash it had received from its investors, a transferor partnership obtained a virtually worthless account receivable. Counsel for the Trustee characterized the overall operation as a Ponzi-type scheme dependent on the constant formation of new partnerships and the generation of new fees. When changes in the economy eliminated the market for new tax shelters, the lack of incoming funds made bankruptcy inevitable.

Throughout these proceedings, both Peterson and the U.S. Trustee have expressed frustration over the difficulty of tracing investor funds so as to determine the cause of partnership losses. Most particularly, they express their belief that one would have to reconstruct all the inter-entity transfers in order to determine the financial condition of any individual or entity involved. The Scotts, on the other hand, have argued that because each partnership and corporation is a separate entity, the assets the Trustee would trace are not property of their individual bankruptcy estates. Also, taking the position that they have cooperated in their

bankruptcy proceedings, the Scotts maintain that they are entitled to discharge.

Although the Trustee complained at the outset of the adversary proceeding that certain financial records of defendants and their related entities were missing, he did not pursue an objection to discharge on the basis of concealment or destruction of records. Nor has he complained in this action that the Scotts failed to appear for meetings with creditors and trustees, or that they have withheld their personal financial records or those of related entities that had filed for bankruptcy.

### *Rulings From Which Appeal Is Taken*

The first three rulings from which appeal is taken were made under § 727, which sets the standards for discharge in a case under Chapter 7. Section 727(a) provides in relevant part as follows:

(a) The court shall grant the debtor a discharge, unless—

(1) the debtor is not an individual;

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred. removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition;

(3) the debtor has concealed, destroyed, mutilated, falsified. or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account;

(B) presented or used a false claim;

(C) gave, offered, received, or attempted to obtain money, property, or advantage, or a promise of money, property, or advantage, for acting or forbearing to act; or

(D) withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs;

(5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities;

(6) the debtor has refused, in this case—

(A) to obey any lawful order of the court, other than an order to respond to a material question or to testify;

(B) on the ground of privilege against self-incrimination, to respond to a material question approved by the court or to testify, after the debtor has been granted immunity with respect to the matter concerning which such privilege was invoked; or

(C) on a ground other than the properly invoked privilege against self-incrimination, to respond to a material question approved by the court or to testify;

(7) the debtor has committed any act specified in paragraph (2), (3), (4), (5), or (6) of this subsection, on or within one year before the date of the filing of the petition, or during the case, in connection with another case, under this title or under the Bankruptcy Act, concerning an insider; . . .

11 U.S.C. § 727(a)(1)-(7). Although at various points the bankruptcy court considered objections to discharge under subsections (4), (5) and (7) of 727(a), appeal is taken only from his rulings under subsections (2) and (3). The orders in question are (1) a January 31; 1992 order granting summary judgment in all three Scotts' favor on Count III of the Trustee's complaint; (2) an October 1, 1993 order granting judgment under Fed.R.Civ.P. 52(c) and Bankr.R. 7052 in favor of Douglas W. and Douglas H.; and (3) the bankruptcy court's oral order of February 3, 1994 granting judgment in favor of Richard E. Advancing chronologically, this memorandum sum-

marizes each ruling and the record before the bankruptcy court when it entered that order. Finally, the court considers the Trustee's appeal from the bankruptcy judge's June 21, 1996 order refusing to reconsider his three earlier rulings.

### (1) Decision on cross-motions for summary judgment on Count III

Count III of the Trustee's complaint contained allegations that, in the period before conversion of their cases from Chapter 11 to Chapter 7, the Scotts misrepresented the value of certain assets in disclosure statements circulated among creditors.

In making that argument, the Trustee focused on the Scotts' interests in Group B Partnership ("Group B") and Group G Partnership ("Group G"),[3] neither of which partnership was a debtor in bankruptcy at times relevant to this dispute. Per the parties' submissions on their motions before the Bankruptcy Court, the Scotts and a wholly-owned corporation owned all the general and limited partnership interests in Group G, as well as all the general partnership interests in Group B. According to defendants, the Scotts owned 84 percent of the limited interests in Group B, and the remaining 16 percent were owned by entities or individuals unrelated to the Scotts. Together Group B and Group G owned all the partnership interests in Burr Oaks Associates ("Burr Oaks"), another limited partnership.

Burr Oaks had filed for bankruptcy in 1985, but was no longer a debtor after its plan of reorganization was confirmed in May 1987. Although not listed as an asset on the Scotts' 1986 bankruptcy schedules, Burr Oaks was listed in their schedule of affairs as an affiliated entity that had filed for bankruptcy the preceding year.[4] In 1985 and in 1987, when Burr Oaks' plan of reorganization was confirmed, Burr Oaks' principal asset was an installment note due from Inland Real Estate Corporation ("Inland") in the face amount of $819,899.79. The note was payable in monthly installments of $4,166.67, with lump sum payments of over $400,000 due on August 29, 1988 and February 28, 1989. In its 1987 disclosure statement, Burr Oaks estimated that the Inland note had a present value of $941,000. DX 33. The Scotts acknowledge that a lump sum was paid in August 1988, and that Inland made a final payment of $481,616.57 on the note at some unspecified point in March 1989.

The Inland note came due while the Scotts were formulating their proposed plans of reorganization, but the facts of the note's existence and maturity were not mentioned on the March 1989 disclosure statements in the Scotts' individual cases. Nor did the Scotts then disclose that a portion of the proceeds from the Inland note were used to purchase subordinated debentures issued by General Homes Corporation ("General Homes debentures"). In all, during 1989, Burr Oaks purchased General Homes debentures in the face amount of $3,325,000 for $470,000.[5]

According to the Trustee, the Scotts had an obligation to disclose that Burr Oaks had received a substantial sum of cash and used the cash to purchase the General Homes

---

**3.** Although the Trustee also asserted that the Scotts had undervalued their ownership interests in Mortgage Fund IX, another partnership, only passing mention of Mortgage Fund IX is made on this appeal. Because to do so would not affect the outcome here. this memorandum does not discuss the evidence presented concerning Mortgage Fund IX.

**4.** The Scotts' bankruptcy schedules indicated that they owned some interest in Group B and Group G, but the nature and extent of those interests, as well as the affiliation with Burr Oaks, were not described. Also, the Scotts' schedules stated that the value of the their partnership interests could not be determined.

While the Trustee's pleadings on the motions for summary judgment complained of the insuffi-

ciency of the 1986 disclosures about the Scotts' partnership interests, he did not argue that omissions in the Scotts' schedules and statements of affairs provided grounds for denying discharge. The question not having been the subject of the rulings below. this court does not address it here.

**5.** The value of the General Homes debentures ultimately decreased over time, but the Scotts estimated in November 1989 that the liquidation value of the bonds ranged from $133,000 to $665,000. In his July 1990 complaint objecting to discharge, the Trustee alleged that the bonds were worth $250,000, and that their value had fluctuated between $400,000 and $800,000 during the period relevant to his suit.

debentures. To fully appreciate the Trustee's argument that the omission constituted "concealment" of assets, it is necessary to review in greater detail how creditors learned of the March transaction. The next few pages provide that discussion.

As part of the reorganization process in their individual cases, the Scotts' filed disclosure statements in March 1989.[6] In a section of the disclosure statements captioned "liquidation analysis," the Scotts included a list of assets and their values "as estimated by the Debtors for which there are no current appraisals ..." Although parcels of realty were separately identified and listed in the liquidation analysis, there was only a single line entry for "interests in partnerships, limited partnerships and corporations." Without providing supporting details, the Scotts assigned liquidation values of $60,000 or $22,-000[7] to their combined corporate and partnership ownership interests.

Following objections by creditors and the U.S. Trustee, the Scotts filed first amended disclosure statements in which they added that they had assigned values of $50,000 and $20,000 to Group B and Group G. The amended statements also disclosed that Groups B and G owned Burr Oaks. While the first amended disclosure statements further indicated that Burr Oaks owned interests in the General Homes debentures, no value was assigned those debentures.

Subsequent to circulation of the first amended disclosure statements, creditors sought discovery concerning Group B, Group G, and Burr Oaks. In November 1989, shortly after the bankruptcy granted the Creditors' Committee's motion to compel, the Scotts circulated second amended disclosure statements. In those statements, the Scotts provided a more extended discussion of the General Homes debentures owned by Burr Oaks. At that time. the Scotts estimated that the liquidation value of the bonds ranged between $133,000 and $665,000. However, they added that because each Scott individually owned a minority interest in Group B and Group G, and because each partnership had liabilities that would have to be satisfied on liquidation, a purchaser would pay only $50,000 or $20,000 for the interest of any one of the Scotts. The discussion of value in the second amended disclosure statements did not take into account the possibility that a purchaser might pay a higher price if the purchaser was able to buy all three Scotts' interests during the course of their contemporaneous bankruptcies.

---

6. Among requirements for confirmation a plan of reorganization, a bankruptcy court must be satisfied that the following requirement has been met:

With respect to each impaired class of claims or interests—
(A) each holder of a claim or interest of such class—
(i) has accepted the plan; or
(ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date ...

11 U.S.C. § 1129(a)(7)(A). Section § 1125, dealing with postpetition disclosure and solicitation, further provides as follows:

An acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan. and a written disclosure statement approved, after notice and a hearing, by the court as containing ade-

quate information. The court may approve a disclosure statement without a valuation of the debtor or an appraisal of the debtor's assets. 11 U.S.C. § 1125(b). Under § 1125—
"adequate information" means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan.
11 U.S.C. § 1125(a)(1).

7. Because Douglas W. owned a combined smaller interest in Groups B and G than did Richard E. and Douglas H., he reported the lower value for his combined interests in all partnerships and for his interests in Groups B and G. Other than this difference in the valuations assigned by each individual, it is apparently undisputed that the disclosures made by the three Scotts were substantially identical in all other respects.

No disclosure statement was ever approved by the court. Instead, as already noted, a trustee was appointed and the individual cases were converted to liquidation under Chapter 7.

In his motion for summary judgment, the Trustee characterized the partnership valuations in the Scotts' disclosure statements as deliberate omissions justifying a denial of discharge. As the Trustee viewed the facts, because the Scotts' valuation of their interests in Groups B and G was far lower than the value of the assets owned by Burr Oaks, creditors reviewing the disclosure statements were not able to discern the true value of the Scotts' interests in partnerships and corporations. Instead, by providing only a single-line estimate of the value of their holdings, the Scotts hid the value of those assets from their creditors. In the Trustee's view, the undervaluation of partnership interests in the Scotts' disclosure statements was tantamount to a concealment within the meaning of § 727(a)(2).

The Scotts cross-moved for summary judgment, arguing, among other things, that because they only indirectly had an interest in Burr Oaks' assets through their ownership interests in Groups B and G, they were not obligated to disclose the value of Burr Oaks' assets on their disclosure statements. The Scotts further took the position that no concealment had taken place, as the Scotts had appeared at creditor meetings and provided reports of financial condition throughout the reorganization proceedings of their related entities.

To support their arguments on the motions for summary judgment, the Scotts explained how they arrived at the valuations on their disclosure statements. Per Richard E.'s deposition testimony, the price of the General Home debentures fluctuated greatly because the bonds were traded in a fairly thin market. Hence, a lower liquidation value than that used by the Trustee was appropriate. The Scotts also took the position that because each individual owned less than half of the partnership interests in Groups B and G,

on liquidation they would only be able to sell their interests in the two partnerships at a substantial discount. The Trustee challenged this latter assertion as exceeding all bounds of credulity, since together the Scotts controlled Groups B and G, and any liquidation would almost certainly take place simultaneously in the three individual bankruptcy cases. Overall, it is clear from the pleadings that the issue of value could not have been determined on summary judgment because of the conflicting evidence about the value of the General Homes debentures.

In ruling on the motions, the bankruptcy judge did not disagree with the Trustee's contention that the Scotts had substantially undervalued their interests in the Group B and Group G partnerships. Nor did his opinion reject the premise that false and misleading disclosure statements are potentially a vehicle through which a debtor may conceal assets. Looking to the Scotts' arguments. he did not endorse their contention that, because they only indirectly owned an interest in the two partnerships' assets, it was sufficient to provide the very scant information that the Scotts had included in their original and first amended disclosure statements. Rather, in his January 31, 1992 order granting judgment in favor of the Scotts on Count III, the bankruptcy court focused on the role that disclosure statements play in the reorganization process.

In his discussion of the procedure normally followed in cases under Chapter 11, the bankruptcy judge stated that debtors may assign liquidation values to their assets in disclosure statements, subject to the scrutiny of other parties in interest. Such representations are neither recorded information within the meaning of § 727(a)(3), nor statements under oath, within the meaning of § 727(a)(4). While the flexible approach provided for approval of disclosure statements under § 1125(a) might cause some debtors to be evasive or dilatory in providing information, parties in interest could move to convert or to dismiss a case under § 1112(b).[8] As

---

8. Section 1112(b) provides in relevant part that ... on request of a party in interest or the United States trustee or bankruptcy adminis-

trator, and after notice and a hearing, the court may convert a case under this chapter to a case under Chapter 7 of this title or may

the bankruptcy judge saw it, § 1125(b) provided creditors with protection from abuse in that the section requires bankruptcy court approval of a disclosure statement before solicitation of acceptances of a plan. *See supra* note 6.

Looking to the facts before him, the bankruptcy judge further observed that creditors in the Scotts' case had been skeptical about the Scotts' "bald-faced conclusions" concerning the liquidation values of their interests in partnerships and corporations. Overall, he characterized additions or changes to disclosure statements like the ones the Scotts had made as illustrative of the give-and-take between debtors and parties in interest that precedes approval of a disclosure statement.[9] Having determined that the Scotts presented only "opinions" as to liquidation values in their disclosure statements, and because he considered the concept of "adequate information" under § 1125(a)(1) an "elusive" one, the bankruptcy court concluded that there was no concealment of property within the meaning of § 727(a)(2). Accordingly, he granted judgment in favor of the Scotts on Count III of the Trustee's complaint.

### (2) First part of trial and entry of judgment under Rule 52(c) in favor of Douglas H. and Douglas W.

On April 26, 1993, the bankruptcy court commenced the trial on the Trustee's complaint. Some of the evidence which has already been summarized in that section of this opinion entitled "Allegations concerning the nature of the Scotts business operations in general" dealt with the uses to which investor funds were in some instances put. Also, Harvalis testified concerning a meeting of creditors[10] in one of the mortgage fund partnership cases. Richard E. appeared at that meeting, which began on March 1, 1989, and

was resumed on March 8, 1989. According to Harvalis, at one point during the questioning he asked about the assets of Scott entities that were not in bankruptcy. Specifically, Harvalis asked about Mortgage Funds 3 and 9. Then, he asked about other non-debtor entities. In Richard E.'s response, Groups B and G were mentioned as partnerships not in bankruptcy, and it was indicated that Groups B and G owned all the partnership interests in Burr Oaks.

Harvalis described the colloquy with Richard E. in the following terms:

> Up to that point we had gone through the assets and liabilities of the mortgage fund debtors and the two non-debtors, that is, Mortgage Funds 3 and 9 in some specific detail. When we got to Group B and Group G and Burr Oaks, the response was less detailed and in a fashion that led me to conclude that the materiality was not important to the overall financial scheme of the overall financial matters of the Scotts. So I did not ask more specific questions nor did they volunteer more specific information other than to intimate that Groups B and G owned all the partnership interests in an entity called Burr Oaks. Beyond that they described Burr Oaks as having some real estate in a Chapter 11 proceeding where the plan had been confirmed some years ago. The real estate got substantial mortgages and was not of consequential value.

April 26, 1993 Tr. at 51–52.

Within weeks of the § 341 meeting, the Scotts filed their first disclosure statements, in which, as discussed in the preceding section of this memorandum, they provided a one-line valuation for all their interests in partnerships and corporations. After objections to that disclosure statement, at a meet-

---

dismiss a case under this chapter, whichever is in the best interest of creditors and the estate, for cause, including continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation ...

11 U.S.C. § 1112(b)(1).

**9.** Later in the case, at the end of the hearing on the Trustee's complaint, the bankruptcy court commented that "as to disclosure statements, also, it is, unfortunately, an activity in Chapter

11 cases for lawyers to run a test balloon to see what type of information will be required of those who are interested in voting on the plan or on the Plan of Reorganization." February 3, 1994 Tr. at 240.

**10.** Under § 341 of the Code, within a reasonable time after the filing of a voluntary petition for bankruptcy, the U.S. Trustee shall convene and preside at a meeting of creditors ("the § 341 meeting").

ing in June 1989, Richard E. informed Harvalis that the valuation was a subjective one. At that time, Richard E. also indicated that Burr Oaks and Mortgage Fund 9 had purchased bonds at a very deep discount from a Houston-based home development company. Richard E. having indicated that the developer was close to bankruptcy, and because of the context in which the comment was made, Harvalis asked no further questions.

According to Harvalis, the second amended disclosure statement circulated in November 1989 led one to question the value of the bonds. Finally, when the Scotts complied with the bankruptcy court's order that they turn over Burr Oaks' records, creditors found records indicating that on February 28, 1989, one day before the § 341 meeting, Burr Oaks might have received a check from Inland for $480,000. Richard E. had not mentioned funds from Inland at the § 341 meeting.

Another focus of the testimony during the subsequent three days of trial was the manner in which entities related to the Scotts recorded transfers of funds between them. The Trustee's basic premise was that, in order to know the financial condition of any one of the Scotts, one would have to audit all the Scott entities. Since, in the view of the Trustee and his accountants, the manner of recording inter-entity transfers of funds made tracing of funds received from investors virtually impossible, the Trustee took the position that discharge should be denied under § 727(a)(3) due to failure to keep adequate financial records.

The Trustee testified that after his appointment, he found records from the Scott entities in varying stages of completeness. The Trustee assigned paralegals to organize and catalog the records and Elson, a forensic accountant, tried to trace funds received from investors.[11] Although Peterson cited the Scotts' use of clearing accounts as a major factor preventing the tracing of funds, he also testified to a belief that some funds could not be traced because books and records for a recipient entity could not be found.

Peterson acknowledged that he personally had not reviewed accounting records or attempted to trace funds.

Elson testified that, because of cost considerations, he had not analyzed all transactions between the Scott entities. Some partnerships were analyzed more in depth than others. While not attesting to missing books and records, Elson specifically noted that two accounting practices had made his task more difficult. First, as already noted, investor funds had been transferred from partnership accounts to clearing accounts, only to be transferred later between Scott entities for the payment of expenses of entities lacking cash. Second, in cases where one partnership loaned money to another partnership, the transaction was recorded as a loan to the Scotts from the first partnership, rather than as a loan from the first partnership to the second partnership. The Scotts would then personally loan funds to the second partnership. Notes documenting the loans to and from the Scotts were not prepared, however, and checks drawn on a transferor partnership's account were made payable to the transferee partnership, rather than to the Scotts.

Elson opined that the Scotts had organized their holdings into a complex web of entities in order to facilitate the transfers of cash that kept the overall organization afloat. This issue under § 727(a)(3), though, is whether records reflect the debtor's financial condition. As an example of how partnership and corporate accounting records related to the Scotts' personal financial records, Elson noted that in a financial statement of September 30, 1984, Richard E. estimated that he owned nonmarketable corporate securities having a value of $1,072,320 and that his equity in limited partnerships had an estimated current value of $556,485. That figure was said to have been calculated by valuing the assets of the partnerships at their estimated current value. Based on his investigation, Elson was unable to explain how the Scotts went from a situation of substantial net worth to one where the debtor partner-

11. Elson was also retained to investigate prepetition financial affairs of the Scotts and their entities with a view toward the identification of transfers potentially voidable under §§ 544, 547 and 548 of the Bankruptcy Code.

ships and individual bankruptcy estates were all administratively insolvent, to the extent that there would be no distribution to unsecured creditors.[12]

Other questions posed to Elson established that transfers of funds between the Scott entities were susceptible of being traced. During the course of questioning, Elson acknowledged that he could recall no instance where checks did not go to the designated payee. In addition, although he had spoken with an accountant formerly employed by the Scotts, Elson had not asked him whether the Scott entities reconciled the accounts in which amounts due from general partners were recorded. At the close of his testimony, Elson responded affirmatively to the following question: "Comparing the task that you described that would be necessary to understand the financial conditions of the defendants with the resources that would be available for a creditor to undertake that effort, would it be fair to say that the web of transactions concealed the financial condition of the Scotts?" April 28, 1993 Tr. at 359.

It was not established at trial that any of the Scotts took an active role in the accounting functions of the various entities. Elson said only that the former employee indicated that Richard E. had some unspecified involvement in the accounting for the Scott entities. That same individual made no representations as to whether Douglas H. or Douglas W. was involved in accounting functions.

At the close of the Trustee's case, the Scotts moved for judgment under Fed. R.Civ.P. 52(c) and Fed.R.Bankr.P. 7052. While refusing to limit the Trustee's potential entitlement to relief to a denial of discharge under either § 727(a)(2) or (a)(3), the causes of action pleaded in the complaint, the bankruptcy judge found that Peterson had produced no evidence of specific actions by either Douglas H. or Douglas W. that would sustain denial of discharge in their individual cases. The issue thus became whether evidence elicited about Richard E.'s actions could bar the discharge of either Douglas.

In the first part of the bankruptcy judge's opinion, which appears to deal with Richard E.'s testimony at the § 341 meeting, the bankruptcy judge found no evidence that either Douglas knew what Richard E. was up to or that either one had consciously avoided learning facts that would reveal what Richard E. was doing. Thus, the only basis for denial of discharge would be the fact of common control of related entities by the three Scotts. In the bankruptcy court's view, "mere partnership is not enough to establish culpability such that a discharge will be denied under Code § 727(a)(2)." October 1, 1993 Memorandum and Order at 10.

The bankruptcy judge addressed the question of recordkeeping as an issue under § 727(a)(3), and not as an issue under § 727(a)(2). Rejecting the reasoning in those cases that had denied discharge on principles of agency where a debtor's partner had failed to maintain adequate books and records, the bankruptcy judge stated that he would adopt the view in some cases that a debtor should not be denied discharge unless he or she either knew of a partner's inadequate recordkeeping or was recklessly indifferent to the state of partnership records. Here it had not been shown that either Douglas was involved in accounting functions, had knowledge, or was indifferent to the entities' recordkeeping. Finally, bearing in mind that the Code's discharge provisions are to be construed liberally in favor of discharge and strictly against an objector, the bankruptcy judge entered judgment in favor of Douglas H. and Douglas W.

In contrast, the bankruptcy judge noted that Elson had testified that Richard E. was involved in accounting activities, and that Harvalis' testimony Supported the Trustee's contention that Richard E. had concealed from creditors the fact of the payment of approximately $480,000 to Burr Oaks. The bankruptcy court concluded that overall, Peterson had submitted sufficient evidence of Richard E.'s culpability, so as to require him to proceed under § 727(a)(2), (3), (4), (5) and (7).

---

12. Elson had only seen Richard E.'s 1984 financial statement. Based on the fact that Douglas H. and Douglas W. owned interests in the same entities, he hypothesized that they too would have reported assets of substantial value around the end of 1984.

### (3) Second part of trial and entry of judgment in favor of Richard E.

The second phase of trial began on February 1, 1994 and ended on February 3, 1994. On the first day, Richard E. commenced the Scotts' case [13] by questioning Patricia J. Nielsen ("Nielsen"), an accounting practitioner whose 25 years of practice had included employment as chief financial officer for many companies and the running of her own private practice. According to Nielsen, she was referred to the Scotts by the Scotts' certified public accountant ("CPA") in or around the spring of 1986. At that time, the Scotts hired Nielsen to perform internal accounting work for their entities. Nielsen filled that position until 1989.

Nielsen testified that, under the supervision of, and at times together with personnel employed by the Scotts' CPAs, she kept accounting records and assisted in the preparation of financial statements and tax reports. Per Nielsen, all transactions were recorded in conformity with generally accepted accounting principles, and tests were performed to insure the accuracy, completeness, and reliability of books and records. According to Nielsen, she only recalled the use of accounts for amounts due to or from general partners during the early part of her employment by the Scott entities. The Trustee did not question Nielsen about matters to which Elson had testified, such as the clearinghouse accounts and the practice of recording transfers to other entities as loans to the Scotts.

Nielsen described Richard E.'s involvement with the accounting work as essentially having been limited to the making of decisions concerning the order in which financial or tax reports were to be prepared. According to Nielsen, Richard E. would also assist her in locating documents she needed for her work.

Following Nielsen's testimony, Richard E. took the stand. In the narrative that followed, he described the growth of the Scotts' involvement in real estate partnerships and the marketing of tax shelters.

Per Richard E.'s testimony, the partnerships were many in number because securities laws limited the number of investors in any one partnership. Also, in order to secure similar writeoffs for tax purposes, it was essential that all investors in a partnership purchase their partnership interests within a particular time frame. Each entity was separately organized, had its own books and records, and filed its own tax returns. Before dramatic changes in the market and the tax laws brought things to a halt in the single-family home limited partnerships around 1985 to 1986, a staff of seven CPAs worked in-house keeping records and preparing tax reports for the Scott entities. In addition, outside auditors examined the records of three Scott entities.

Richard E. stated that after his appointment, the Trustee reorganized the records for the Scott entities, lumping records together in a way that did not reflect how the records historically had been kept. Although the Trustee initially complained to him that certain documents were missing, Richard E. was able to locate them.

Turning to the question of his testimony at the March 1989 § 341 meeting, Richard E. stated that he believed he answered truthfully when asked a question that elicited information about Groups B and G. On the other hand, Richard E. could not recall the specific question asked. Richard E. acknowledged that the due date of the Inland note was February 28, 1989, two days before the commencement of the § 341 meeting, but he observed that the payment was not made on time. Richard E. professed inability to recall the date payment was received, although he agreed that it was logical that money used on March 6 to purchase General Homes debentures would have come from the Inland note. He further stated that he did not know whether he was asked about Groups B and G at the initial meeting on March 1 or the continued meeting on March 8, and he complained that when he tried to subpoena the tape of the § 341 meeting, Harvalis informed him that the tape could not be located.

When asked about the $556,000 value placed on partnership interests on his 1984

13. Throughout the adversary proceeding and on this appeal, the Scotts have proceeded *pro se.*

financial statement, Richard E. estimated that 75 percent of that value corresponded to his interest in the single-family home partnerships. Since 1984, though, the value of those partnerships had declined and his interests in Groups B and G had increased. Also, because Groups B and G were not debtors in bankruptcy, there would have been no filings with the bankruptcy court showing their interest in Burr Oaks. Richard E. denied any attempt to conceal the fact of the Inland note coming due in 1988 and 1989, however, as Burr Oaks' 1987 plan of reorganization would have revealed that fact. Notwithstanding his insistence that disclosure two years earlier in a different bankruptcy case relieved him from any obligation to disclose the existence of the Inland note, Richard E. admitted that most of the creditors receiving notice of the Burr Oaks bankruptcy were other Scott entities. Finally, Richard E. acknowledged that in his own reorganization case, fuller disclosure about Burr Oaks and the General Homes debentures came only after objection by the U.S. Trustee, and after the bankruptcy court ordered the production of Burr Oak records in November 1989.

In his oral ruling at the close of the evidence, the bankruptcy judge found that Peterson had failed to prove his allegations by a preponderance of the evidence. In that portion of his comments dealing with the § 341 meeting, the bankruptcy judge noted that there was no transcript of the meeting. Characterizing as self-serving the testimony as to each side's recollection of the meeting, and commenting that it would be foolish on Harvalis' part to accept without further inquiry any assertion that the value of the nondebtor partnerships was inconsequential, the bankruptcy judge declined to find a false statement under oath. As he saw it, Richard E. should have told creditors at the § 341 meeting about the $480,000 coming to Burr Oaks, but attorneys for creditors also have some obligation to press for more information when a debtor's answers to questions are inadequate. While noting that a debtor has a duty under § 521 to provide information concerning its affairs, the bankruptcy judge felt that sufficient cooperation had been shown.

Addressing again the question of the valuation of partnerships in the Scotts' disclosure statements, the bankruptcy judge concluded that Richard E.'s estimate of the partnerships' value was not a representation made with such a level of culpability that intent to hinder, delay or defraud could be found. Overall, the $60,000 figure was not so unwarranted that one could find fraud or intent to hinder or delay.

Finally, looking to the question of record-keeping, the bankruptcy judge commented that the machinations of the Scott entities were of concern to the court. However, in his view, Elson's testimony did not establish that the trustee was hindered in determining what property belonged to the estate. To the contrary, the testimony at trial established that records were kept and that transactions were documented. There was no evidence of falsified records and all records were turned over to the Trustee. As the bankruptcy judge saw it, where circumstances warrant, it may be necessary to call on a debtor or its personnel to provide an explanation of the debtor's records. Here, though, the trustee had not asked Richard E. to explain the Scott entities' records. That effort not having been made, the bankruptcy judge felt that it would be unfair to deny discharge.

### (4) Remand to the Bankruptcy Court

As already noted, the three orders under § 727(a)(2) and (3) were previously the subject of appeal in Civil Case 94 C 1749, assigned to Judge Duff. Before reaching the substantive issues raised, however, Judge Duff remanded the case to the bankruptcy court with directions to reconsider its orders "in view of the related post judgement [sic] criminal convictions of Richard E. Scott and Douglas W. Scott on charges of RICO Conspiracy pursuant to 18 U.S.C. § 1962(d); Criminal RICO pursuant to 18 U.S.C. § 1962(c); Mail Fraud pursuant to 18 U.S.C. § 1341; and Richard E. Scott's conviction for Making False Statements to the S.E.C. pursuant to 18 U.S.C. § 1001." Judge Duff provided no further explanation of the basis

for his ruling in his written order, and he did not reverse the bankruptcy court.

On remand, at a status hearing of October 2, 1995, the bankruptcy judge noted that he had not been provided a transcript of the hearing where Judge Duff announced his decision. This being so, the bankruptcy judge considered himself at something of a loss as to how to proceed. He emphasized, though, that his orders had not been reversed. The parties were not able to explain fully the reasons for remand either, as there had been no motion for remand. The Trustee's attorney suggested that remand was in lieu of entry of a settlement agreement between the Trustee and the Scotts that had been opposed by the U.S. Trustee's Office and by United States Attorney's Office. Although the Trustee had not sought remand, he posited that the bankruptcy court could take judicial notice of the fact that a jury had found beyond a reasonable doubt that Richard E. and Douglas W. had defrauded the SEC and investors.

In briefs on remand, the Trustee argued that the criminal convictions shed new light on the intent underlying the actions previously complained of in the Trustee's adversary proceeding. The U.S. Trustee also prepared briefs in which it argued that the criminal convictions were new developments outside the trial record of which the court could take judicial notice. As had the Trustee, the U.S. Trustee requested that the bankruptcy court reconsider its earlier rulings granting discharges to the Scotts. While the U.S. Trustee's supplemental brief on remand described some evidence from the criminal trial, that essentially corroborated Elson's testimony regarding transfers of funds between the Scott entities. No claim was made that there was newly discovered evidence within the meaning of Fed.R.Civ.P. 60(b)(2) and Bankr.R. 9024. Indeed, the evidence related almost entirely to the years 1983 and 1984, before the collapse of the tax shelter market and the Scotts' bankruptcy filings.

In an opinion of June 21, 1996, the bankruptcy judge stated that he was unable to accept the proposition that evidence submitted in another case is sufficient to set aside a finding of fact made on the evidence before the bankruptcy court. In his view, considerations of fairness precluded him from considering evidence from the criminal trial unless his prior rulings were wrong. Looking back on the proceedings, the bankruptcy judge saw no error in his earlier conclusion that the Trustee had failed to establish his claims. Although the Trustee and U.S. Trustee had not moved for revocation of discharge, the bankruptcy court also addressed whether the criminal convictions would be sufficient for revocation of the discharge. Because there was no showing that any of the Scotts had obtained his discharge by means of fraud, he declined to consider revocation of the discharge.

Among the bankruptcy court's other comments, he expressed concern that the U.S. Trustee would use evidence from the criminal case against Douglas H., who had not been a party to those proceedings. Finally, he expressed a belief that use of evidence from the criminal case would potentially foster abuse and uncertainty. In the words of the bankruptcy judge, "[a]n otherwise valid discharge would immediately become suspect upon a debtor's subsequent conviction and provide a trustee, or anyone, with a second shot that but for the criminal conviction would not have been available."

## DISCUSSION

The orders appealed from here were entered in a "core" proceeding before the bankruptcy court. 28 U.S.C. § 157(b)(2)(J). In appeals from such orders, conclusions of law are reviewable *de novo,* while findings of fact are not to be set aside unless clearly erroneous. *Matter of Sheridan,* 57 F.3d 627, 633 (7th Cir.1995); *Matter of Adventist Living Centers, Inc.,* 52 F.3d 159, 163 (7th Cir.1995); *Matter of C & S Grain Co., Inc.,* 47 F.3d 233, 236 (7th Cir.1995); *Meyer v. Rigdon,* 36 F.3d 1375, 1378 (7th Cir.1994); *Matter of Thirtyacre,* 36 F.3d 697, 700 (7th Cir.1994); *Apostolou v. Fisher,* 188 B.R. 958, 963 (N.D.Ill.1995) (citing Fed.R.Bankr.P. 8013). Since this case must be remanded to the bankruptcy court if the bankruptcy erred in refusing to consider evidence from the trial in the criminal case against Richard E. and Douglas W., the

court first considers the bankruptcy judge's order of June 21, 1996.

### Decision on remand

■ On this appeal, the Trustee has not argued that the bankruptcy judge erroneously declined to consider revocation of the discharge. Rather, as he did on remand, he cites decisions concluding that an appellate court may, in appropriate circumstances, take judicial notice of facts not in the record before the trial court. However, none of the decisions relied on by the Trustee deal with circumstances even remotely analogous to the fact situation presented here. It is also noteworthy that, except for one case where the material outside the record merely corroborated a proper factfinding made by the lower court, *Matter of American Biomaterials Corp.*, 954 F.2d 919, 922 (3rd Cir.1992), the appellate courts whose decisions are cited would have left for the district court on remand any matter involving the weight or sufficiency of the evidence. *Orthmann v. Apple River Campground, Inc.*, 757 F.2d 909, 914–915 (7th Cir.1985); *United States v. Lowell*, 649 F.2d 950, 966–967 (3d Cir.1981); *Landy v. Federal Deposit Ins. Corp.*, 486 F.2d 139, 150–152 (3d Cir.1973). As this court reads these decisions, in each case the appellate court contemplated that the lower court would apply the customary rules of procedure when considering new evidence on remand.

Following the lead of the Trustee, and treating the motion after remand to the bankruptcy court as a motion for reconsideration, Fed.R.Civ.P. 60 would apply through the operation of Bankr.R. 9024.[14] *Matter of Met–L–Wood Corp.*, 861 F.2d 1012, 1018 (7th Cir.1988), *cert. denied sub nom. Gekas v. Pipin*, 490 U.S. 1006, 109 S.Ct. 1642, 104 L.Ed.2d 157 (1989). Where, as here, the motion would be brought under Fed.R.Civ.P. 60(b), relief from the judgment is considered an extraordinary remedy granted only in exceptional circumstances. *E.g., Donald v. Cook County Sheriff's Dep't.*, 95 F.3d 548, 554 (7th Cir.1996); *Tobel v. City of Hammond*, 94 F.3d 360, 362 (7th Cir.1996). Generally, such motions must establish either a manifest error of law or fact or present newly discovered evidence. *Dresser Indus.,Inc. v. Pyrrhus AG*, 936 F.2d 921, 936 (7th Cir.1991). Newly discovered evidence is that evidence which, despite due diligence, could not have been discovered in time to move for a new trial under Fed.R.Civ.P. 59(b). *Matter of Chicago, Milwaukee, St. Paul & Pacific R. Co.*, 78 F.3d 285, 293–294 (7th Cir.1996), *cert. denied sub nom. CMC Heartland Partners v. Union Pacific R. Co.*, — U.S. —, 117 S.Ct. 763, 136 L.Ed.2d 710 (1997); *Central States, Southeast and Southwest Areas Pension Fund v. Central Cartage Co.*, 69 F.3d 1312, 1314 (7th Cir.1995), *cert. denied*, — U.S. —, 116 S.Ct. 1419, 134 L.Ed.2d 544 (1996); *In re Iaquinta*, 97 B.R. 959, 960 (Bankr.N.D.Ill.1989).

Applying the above principles here, this court finds no error in the bankruptcy judge's decision on remand. For reasons stated in the sections that follow, no manifest error of fact or law in the bankruptcy court's orders under § 727(a) has been established. Nor did the Trustee establish that evidence from the criminal trial was newly discovered evidence within the meaning of Fed.R.Civ.P. 60(b)(2). While the criminal convictions were rendered subsequent to the decision in the adversary proceedings, the facts on which the convictions were based were not newly discovered either. The Trustee having presented no authority allowing the judgment in a civil case to be vacated where that case went to trial rather than awaiting disposition of a criminal proceeding arising out of common facts. this court concludes that reconsideration was properly denied.

### Preliminary Note to Discussion of Issues Under § 727(a)

Before the bankruptcy court on remand, the U.S. Trustee provided the following description of its interest in pursuing its objection to discharge.

The defendants have perpetrated a massive investor fraud scheme wherein they reaped million of dollars in profits from unsuspecting investors who they victimized

---

14. This court expresses no opinion as to whether the bankruptcy court properly treated the motion for reconsideration as a motion for revocation of the Scotts' discharges in bankruptcy.

by preying on their lack of sophistication and luring these investors into a false sense of security with intentional misrepresentations. The seriousness of their activities is demonstrated by the related criminal convictions of Richard and Douglas W. Scott. The filing of the defendants' bankruptcy cases facilitated the ongoing frauds as it permitted them to continue the concealment of their assets and financial wrongdoing. This was and continues to be an abuse of the bankruptcy system.

Memorandum of the U.S. Trustee in Support of Plaintiff on Remand at 20. Similar statements have also been made on appeal. See e.g., Brief for the U.S. Trustee as Amicus Curiae Supporting Appellant at v. Notably, though, the evidence of specific instances of misuses of investor funds in this record seems to predate the Scotts' bankruptcy petitions.

In support of its position that the Scotts should be denied discharge, the U.S. Trustee points to the Supreme Court's admonition that the opportunity for a completely unencumbered beginning is limited to the honest but unfortunate debtor. *Grogan v. Garner,* 498 U.S. 279, 286–287, 111 S.Ct. 654, 659–660, 112 L.Ed.2d 755 (1991) (citing *Local Loan Co. v. Hunt,* 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934)). *See also Matter of Garman,* 643 F.2d 1252, 1257 (7th Cir. 1980) ("We believe the [Bankruptcy] Act was meant to discharge only the *honest* debtor from his debts ... and that the Act should be liberally applied to protect the bankrupt only in those cases when there is no intent to violate its provisions.")

Unlike many cases where discharge has been denied, however, the Trustee has not complained of a series of dishonest acts during the course of the Scotts' bankruptcies. Rather, the principal wrongs perpetrated would have taken place outside of bankruptcy. As set in the paragraphs that follow, this court believes that the unusual circumstances of this case called for a balancing of competing policy considerations under the Bankruptcy Code.

It is fundamental that § 727 makes complete financial disclosure a condition precedent to the privilege of discharge. *United*

*States v. Ellis,* 50 F.3d 419, 424 (7th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 143, 133 L.Ed.2d 89 (1995); *In re Cox,* 41 F.3d 1294, 1296 (9th Cir.1994) (purpose of § 727 is to make privilege of discharge dependent on true presentation of debtor's financial affairs). On the other hand, it is equally well established that the statutory requirements for discharge are to be construed liberally in favor of the debtor, and that the reasons for denying discharge " 'must be real and substantial, not merely technical and conjectural.' " *Meyer v. Rigdon,* 36 F.3d 1375, 1385 (7th Cir.1994); *In re Burgess,* 955 F.2d 134, 137 (1st Cir.1992) (citations omitted); *see also In re Devers,* 759 F.2d 751, 754 (9th Cir.1985) (statute is to be construed liberally in favor of debtor and strictly against objector). "Denying a debtor his discharge, as opposed to avoiding a transfer or declining to discharge an individual debt pursuant to § 523, is an extreme step and should not be taken lightly." *Rosen v. Bezner,* 996 F.2d 1527, 1531 (3d Cir.1993).

Obviously, the complexity of the Scotts' business organization, as well as the magnitude of losses suffered by creditors of the various Scott entities, made this case an atypical one. However, as discussed below, the Trustee took positions that, if accepted, would arguably extend the law governing discharge. While not intimating that the Trustee's arguments lacked merit, based on its review of the record and the law, this court concludes that the bankruptcy judge did not err in construing § 727 in favor of the Scotts.

### Decisions under § 727(a)(2)

In his argument under § 727(a)(2), the Trustee contends that the Scotts should have been denied discharge because, during the course of their Chapter 11 cases, they concealed the fact that Burr Oaks held assets having a value of between $400,000 and $800,000. As already noted, the bankruptcy judge addressed this question on two separate occasions. This memorandum addresses in turn those two orders of January 31, 1992 and February 3, 1994.

(1) *January 31, 1992 Order*

 In appealing the bankruptcy court's order dismissing Count III of his adversary complaint, the Trustee invokes the following general proposition of bankruptcy law:

> ... the very purpose of certain sections of the law, like 11 U.S.C. § 727(a)(4)(A), is to make certain that those who seek the shelter of the bankruptcy code do not play fast and loose with their assets or with the reality of their affairs. The statutes are designed to insure that complete, truthful, and reliable information is put forward at the outset of the proceedings, so that decisions can be made by the parties in interest based on fact rather than fiction ... Neither the trustee nor the creditors should be required to engage in a laborious tug-of-war to drag the simple truth into the glare of daylight.

*In re Tully*, 818 F.2d 106, 110 (1st Cir.1987) (citations omitted). Also, unless there is factual support, statements of opinion or belief are entirely inappropriate in disclosure statements filed pursuant to § 1125. *In re Egan*, 33 B.R. 672, 675 (Bankr.N.D.Ill.1983). On the other hand, the Trustee has cited no authority, and this court's research has found no decisions, finding that an undervaluation of assets in a disclosure statement constitutes concealment within the meaning of the objection to discharge at § 727(a)(2).

· In the court below, the Trustee cited a number of cases sustaining an objection to discharge where a debtor had undervalued the assets described in the schedules submitted with its bankruptcy petition. *See, e.g., In re Ligon*, 55 B.R. 250 (Bankr.M.D.Tenn. 1985); *In re Seruntine*, 46 B.R. 286 (Bankr. C.D.Cal.1984). Similarly, in cases where a debtor knowingly omitted assets from schedules or failed to disclose the existence of certain assets during testimony under oath, discharge has been denied. *See In re Chalik*, 748 F.2d 616 (11th Cir.1984); *In re Trauger*, 101 B.R. 378 (Bankr.S.D.Fla.1989); *Sullivan v. Tracey*, 76 B.R. 876 (Bankr.D.Mass. 1987). Significantly, though, denial of discharge was based on § 727(a)(4)(A), which denies discharge if a debtor "knowingly and fraudulently, in or in connection with the case made a false oath or account." It is not contended that disclosure statements are made under oath. Here, the Trustee invokes the exception to discharge at § 727(a)(2), which provides that discharge may be denied when a debtor "with intent to hinder, delay, or defraud a creditor or an officer of the estate," has concealed property of the estate.

There is some overlap between the provisions for denial of discharge at subsections (2) and (4) of § 727(a). *In re Mathern*, 137 B.R. 311, 326 (Bankr.D.Minn.), *aff'd*, 141 B.R. 667 (D.Minn.1992). Also, courts have found that an undervaluation of assets constituted concealment, within the meaning of § 727(a)(2). *See In re McGee*, 157 B.R. 966, 974, 976 (Bankr.E.D.Va.1993); *In re Dreyer*, 127 B.R. 587, 593 (Bankr.N.D.Tex.1991). In those cases, intent to hinder or delay creditors was inferred from the course of the debtor's conduct during the bankruptcy proceedings. As is not the case here, though, there were numerous deceptive acts by the debtor during the bankruptcy. In contrast, the Trustee in this case would apparently rely on actions before the filing of the Scotts' bankruptcy to establish the intent requisite to a finding under § 727(a). As this court reads his opinions, the bankruptcy judge made no explicit finding regarding the Scotts' intent. Instead, he found no "concealment" within the meaning of the statute.

Under the common law, an omission or failure to disclose material facts is not actionable absent breach of a duty to speak. *See Havoco of America, Ltd. v. Sumitomo Corp. of America*, 971 F.2d 1332, 1341 (7th Cir. 1992); *Equity Capital Corp. v. Kreider Trans. Serv., Inc.*, 967 F.2d 249, 253 (7th Cir.1992). *See also Kohler v. Leslie Hindman, Inc.*, 80 F.3d 1181, 1188 (7th Cir.1996) (breach of duty is essential element of claim of constructive fraud). Commentators on bankruptcy law also opine that concealment includes the withholding of knowledge of assets by failure or refusal to divulge *owed* information. 6 Lawrence P. King, *Collier on Bankruptcy* ¶ 727.02[6][b] (15th rev. ed.1996). Here the Trustee would find a duty to disclose under §§ 521 and 1129 of the Bankruptcy Code.

468

Section 521 enumerates duties of a debtor in a bankruptcy case. Those duties include the following:

(1) file a list of creditors, and unless the court orders otherwise, a schedule of assets and liabilities, a schedule of current income and current expenditures, and a statement of the debtor's financial affairs;

...

(3) if a trustee is serving in the case, cooperate with the trustee as necessary to enable the trustee to perform the trustee's duties under this title;

(4) if a trustee is serving in the case, surrender to the trustee all property of the estate and any recorded information, including books, documents, records, and papers, relating to property of the estate....

11 U.S.C. § 521. Since it is not contended that the Scotts failed to make necessary filings or turn over financial records, the inquiry focuses on failure to cooperate with the bankruptcy trustee. In considering that question, the court must take into account that the Scotts' disclosure statements were filed before the case was converted to a proceeding under Chapter 7.

In the period before conversion of their bankruptcies to cases under Chapter 7, the Scotts, as debtors in possession, would have had the responsibility of performing duties of a Chapter 11 trustee. 11 U.S.C. § 1107(a). Excepted from the obligations of a debtor in possession, though, are a trustee's duties under § 1106(a)(3) and (4), which encompass investigation of the debtor's assets, liabilities, and financial condition.[15] The structure of Chapter 11, then, takes into account that debtors in possession may be less than totally forthright concerning their affairs. While the Trustee also argues that an obligation of full disclose is implicit in the requirement under § 1129(a)(3) that a reorganization plan be proposed in good faith, he cites no authority specifying the amount of detail that must be provided concerning assets listed in a debtor's disclosure statement.

This court has reviewed the record on the cross-motions for summary judgment, read the cases cited, and performed its own research on the legal question presented. Based on that review, it believes that the bankruptcy judge confronted a legal argument that would potentially expand existing law under § 727(a)(2). There were no cases directly on point. The bankruptcy judge considered the Trustee's arguments, taking into account his experience with disclosure statements in Chapter 11 cases. Among facts here, active involvement by creditors had led to fuller disclosure of Burr Oak's assets. This court concludes that, based on the record and the totality of the circumstances before him, the bankruptcy court properly determined that the actions complained of did not constitute concealment within the meaning of § 727(a)(2).

(2) *February 3, 1994 Order*

▇▇▇In his ruling at the conclusion of trial, the bankruptcy judge addressed the question whether Richard E.'s testimony at the § 341 meeting in the mortgage find cases constituted a concealment within the meaning of § 727(a)(2), While it is clear that Richard E. had not informed creditors about substantial funds from the inland note coming into Burr Oaks' possession within days of the meeting, the evidence of record did not establish what specific questions were asked of Richard E. According to Harvalis' testimony, Richard E.'s response regarding Groups B and G was phrased in such a way that Harvalis made a judgment that there was no need for further questioning along that line. Most problematically, the tape made of the § 341 meeting could not be found.

A debtor's deliberately evasive or misleading answers about the value of a stock have been found a concealment under § 727(a)(2). *See In re McGee,* 157 B.R. 966, 976 (Bankr. E.D.Va.1993); *In re Dreyer,* 127 B.R. 587, 593 (Bankr.N.D.Tex.1991). However, without the tape of the hearing, the bankruptcy judge was unable to assess whether Harvalis' failure to pursue further questioning at the § 341 meeting was caused by error on his

---

15. These matters may be investigated by the official unsecured creditors' committee. which is appointed in most Chapter 11 cases. 1 Robert E. Ginsberg and Robert D. Martin, *Ginsberg & Martin on Bankruptcy* § 4.01[I] (4th ed.1996).

own part or by misleading answers on Richard E.'s part. Also, the Trustee has not established that a Chapter 11 debtor's duty to cooperate during a bankruptcy extends as far as the Trustee would extend it in this case. Having reviewed the record, the court concludes that the bankruptcy court properly found that the Trustee had not established his premise under § 727(a)(2).

### Decision under § 727(a)(3)

■ The main thrust of the Trustee's argument under § 727(a)(3) is that, to find out why the Scott partnerships did not repay investors, one would have to trace all transfers of funds between all the Scott entities. Citing Elson's descriptions of commingling of funds in clearinghouse accounts, as well as Elson's examples of the use of funds invested in several partnerships, the Trustee argues that discharge should be denied because it is virtually impossible to trace all funds received by the partnerships. The Scotts'[16] response is essentially that adequate records were kept for all entities and that the records in question were not those of the individual Scotts, but the records of separate entities. While not agreeing that this latter premise is determinative, this court affirms the bankruptcy court's February 3, 1994 ruling under § 727(a)(3).

■ Section 727(a)(3) of the Code requires that, as a precondition to discharge, a debtor must produce records that provide creditors and the bankruptcy trustee with enough information to ascertain the debtor's financial condition and to track the debtor's financial dealings with substantial completeness and accuracy for a reasonable period from the past into the present. *Matter of Juzwiak*, 89 F.3d 424, 427-28 (7th Cir.1996). While the sufficiency of records is determined on a case-by-case basis, considering

the size and complexity of the debtor's business, in all cases complete disclosure is required. *Meridian Bank v. Alten*, 958 F.2d 1226, 1230 (3d Cir.1992); *In re Bailey*, 145 B.R. 919, 924 (Bankr.N.D.Ill.1992). In cases where a debtor has produced a mass of source documents evidencing its transactions, a common inquiry made is whether accounting records are available that summarize the transactions or otherwise provide a paper trail through the maze of primary documents. *See eg., In re Vandewoestyne*, 174 B.R. 518, 522 (Bankr.C.D.Ill.1994); *In re Frommann*, 153 B.R. 113, 118 (Bankr. E.D.N.Y.1993); *see also In re Pulos*, 168 B.R. 682, 691 (Bankr.D.Minn.1994) (quality, not quantity, is relevant to § 727(a)(3) inquiry). The burden is not on the trustee or creditors to organize and reconstruct the debtor's business affairs. *Juzwiak*, 89 F.3d at 429.

■ A creditor objecting to discharge under § 727(a)(3) must initially show that the debtor failed to maintain adequate records and that such failure makes it impossible to ascertain the debtor's financial condition or transactions. *In re Cox*, 41 F.3d 1294, 1296 (9th Cir.1994). Once the objecting party has shown that the debtor's records are absent or inadequate, the burden of proof shifts to the debtor to justify the inadequacy or lack of records. *Id.* "Although the ultimate goal of § 727(a)(3) is to distinguish between the honest debtor, who should be granted the privilege of discharge, and the abusive or unworthy debtor, who does not deserve such a benefit, ... creditors do not need to prove that the debtor intended to defraud them in order to establish a § 727(a)(3) violation." *Juzwiak*, 89 F.3d at 430 (citations omitted); *In re Volpert*, 175 B.R. 247, 265 (Bankr. N.D.Ill.1994). The test for justification is an objective one, focusing on whether others in like circumstances would ordinarily keep fi-

**16.** Although the briefs on this appeal discuss the bankruptcy judge's decision under § 727(a)(3) as applicable to all three Scotts, the bankruptcy judge had already dismissed the Trustee's claims against Douglas H. and Douglas W. on the basis that it had not been shown that they were involved in accounting for the Scott entities. Also, the only individual financial record introduced into evidence was that of Richard E. The Trustee has not addressed this aspect of the bankruptcy judge's ruling in appealing from the ruling in favor of the two Douglases. Consistent with the parties' practice, and since to do so does not alter the conclusion reached, this memorandum refers to the February 3, 1994 decision under § 727(a)(3) as a decision in favor of all three Scotts.

nancial records. *Cox*, 41 F.3d at 1297; *Pulos*, 168 B.R. at 692.

 A court has broad discretion in determining whether records produced by a debtor are sufficient. *Frommann*, 153 B.R. at 117; *In re Drenckhahn*, 77 B.R. 697, 708 (Bankr.D.Minn.1987). Interestingly, too, before denying discharge under 727(a)(3), the Eleventh Circuit has allowed a debtor to organize its records at the debtor's own (not the bankruptcy estate's) expense. *In re Hughes*, 873 F.2d 262, 264 (11th Cir.1989); *In re Hoflund*, 163 B.R. 879, 884 (Bankr. N.D.Fla.1993). *See also In re Martin*, 141 B.R. 986, 997 (Bankr.N.D.Ill.1992) (allowing debtor's accountant to explain loans from corporation to debtor and value of debtor's stock in corporation wholly owned by debtor and family members). An important factor here is that the Trustee complains not of the Scotts' own financial records, but of the records of the entities, they controlled.

There are a number of cases where an individual debtor has been denied discharge because of the inadequate records of a separate business entity controlled by the debtor. *See e.g., In re Nipper*, 186 B.R. 284, 289 (Bankr.M.D.Fla.1995): *In re Bailey*, 145 B.R. 919, 924 (Bankr.N.D.Ill.1992); *In re Pimpinella*, 133 B.R. 694 (Bankr.E.D.N.Y. 1991); *In re Greene*, 202 B.R. 68, 71 (Bankr. D.Md.1996) (business records of debtor's controlled corporation were combined with those of debtor's sole proprietorship). However, other courts have refused to grant a motion under § 727(a)(3) where the records challenged as inaccurate or incomplete were those of a bona fide separate entity. *See, e.g., In re White*, 177 B.R. 110, 114–15 (Bankr.M.D.Fla.1994); *In re Vetri*, 155 B.R. 782, 785 (Bankr.M.D.Fla.1993), *aff'd*, 174 B.R. 143 (N.D.Fla.1994); *In re Morando*, 116 B.R. 14, 17 (Bankr.D.Mass.1990). Also, the Trustee has not cited authority establishing a standard for recording the value of an individual's investment in partnerships and corporations.

In its research, this court has found only one case under § 727(a)(3) in which debtors owned interests in a multitude of entities. *In re Mathern*, 137 B.R. 311 (Bankr. D.Minn.). *aff'd*, 141 B.R. 667 (D.Minn.1992).

In *Mathern*, the creditor objecting to discharge complained that the debtors had produced a mountain of records relating to their interests in 50–odd business entities. As here, the creditor complained that the documents revealed "an almost impenetrable maze of transactions by and between numerous business entities." *Id.*, 137 B.R. at 317. The debtors' response was that they had offered to guide the creditor through the records and that they had produced several summaries of the contents of the records. *Id.*

Without stating that the debtors' response would ordinarily be sufficient to overcome an objection to discharge under § 727(a)(3), the *Mathern* court denied the creditor's motion for summary judgment. *Id.* The basis of the court's determination was the lack of focus in the creditor's assertions as to the inadequacy of records. *Id.* at 318. Since the debtors' documents were only described in a broad fashion, the court could not ascertain how the creditor went about its review of the records. *Id.* Given that fact, the creditor's expressions of frustration at being presented an undifferentiated mass of paper were insufficient to rebut the inference that there was a way through the maze. *Id.* In passing, *Mathern* also commented that due process requires that a debtor be asked to explain matters for which explanation is sought. *Id.* at n. 7. Since the purpose of § 727 is to deny discharge to a debtor who refuses to cooperate, a "documents case," standing alone, is an insufficient basis for denying discharge. *Id.*

While the creditor in *Mathern* did not complain about a massive fraud like the one allegedly perpetrated by the Scotts, there is a parallel between *Mathern* and this case in that the Trustee's § 727(a)(3) argument relied on Elson's testimony that it was very difficult to trace transactions between the Scott entities. Elson did not say that there was no paper trail, however, and the Scotts presented unrebutted testimony that all transactions were recorded in accordance with generally accepted accounting principles, with some supervision by CPAs from outside accounting firms. In addition, it was not shown that the Scotts failed to keep the kind of records of their equity in partner-

ships that similarly situated individuals would keep. Having reviewed the case law and the record from the court below, this court affirms the bankruptcy judge's ruling that § 727(a)(3) does not provide a basis for denying discharge in this case.

## CONCLUSION

For the reasons set forth above, the court affirms the orders of the bankruptcy court.